TURNBULL VS. TURNBULL.

23   615
73   287

Where the evidence, in a bill for divorce by the husband, fully establishes the fact of adultery on the part of the wife, and that, afterwards, and with a full knowledge of her guilt, he received and kept her as his wife, the law will imply that he remitted her fault and forgave her the violation of her marriage vow—the doctrine of condonation as acted upon in all English and American courts, where divorces are granted, not being destroyed by the statute upon divorces.

*Appeal from Pulaski Chancery Court.*

Hon. URIAH M. ROSE, Chancellor.

GARLAND & RANDOLPH, for the appellant.

Mr. Justice COMPTON delivered the opinion of the Court.

Having carefully examined this case, and found no error in the record, we affirm the decree of the court below, and direct that the opinion of the chancellor be reported as expressing, fully, the views of this court.

## CHANCELLOR'S OPINION.

The plaintiff seeks to obtain a divorce from the defendant on account of adultery, which he says was committed by her with a person named Thomas Connor, at a public hotel called the Anthony House, in the city of Little Rock, during the month of November, 1859.

The defendant answered the bill; positively denied the fact of adultery as charged, and asserted that she had, at all times, demeaned herself as a true and faithful wife of the plaintiff; and that after the time that the plaintiff says in his bill that he became convinced of her infidelity, he continued to live with her on the same terms of confidence as formerly, and to treat her with the same kindness.

It appears from the bill and from the evidence, that at the time of the alleged commission of the act of adultery, the plaintiff was the manager of a theatre in Little Rock, and that, the adulterer was an actor in his employment.

The evidence also shows that the defendant, for two or three years before the time of her alleged offence, was a very light and imprudent woman, very fond of the society of other men besides her husband, and very unrestrained in her manners at all times. That at Hot Springs in 1858 and 1859, she was so indiscreet as to attract the attention of visitors: that she was in the company of Connor on every opportunity afforded by the absence of her husband: that on one occasion she expressed herself in the presence of more than one person as having an affection for Connor, and said that she did not care who knew it, and that on being remonstrated with, and told that she was acting badly, she said that she did not care: that during the month of November, 1859, the plaintiff went to Memphis, leaving his wife at the Anthony House, where they were then boarding; that during the absence of the plaintiff, Connor was in the room of the defendant every day, and that one day she was seen in the room of an actress named, or called, Oceana, with Connor, and that while there she used very inde-

cent and unbecoming familiarities with him: that while the plaintiff was gone to Memphis, Connor was seen to go into defendant's room at about twelve or one o'clock at night, and that he did not come out until after 8 o'clock next morning, until which time the witness, who was employed as watchman at the hotel, kept guard, that about six or seven o'clock next morning after Connor went into the room, the little sister of the defendant and another girl went to the door of the room and tried to get in, but could not; that soon after the plaintiff's return from Memphis, Connor came in the night into the hall upon which the defendant's room opened, turned down the lights in the hall, examined the premises as if to see whether any one was about, and then knocked at defendant's door, went in, remained ten or fifteen minutes, and then came out, and that the plaintiff was not in the house at that time. It is also proved that these facts, which transpired at the Anthony House, were made known to the plaintiff on or about the 15th day of December, 1859, and that soon afterwards the plaintiff shot Connor in his wife's room.

The fact that Connor was seen to go into the defendant's room at night, was testified to by a witness whose name is McDaniels, and who was the watchman above mentioned. But of the intimacy which existed between her and Connor, of her language wherein she expressed her preference for him, and of the scene in Oceana's room, we have the evidence of other witnesses. There is something in the evidence of the sister of the defendant, which militates against that of the witness Mc-Daniel, but not enough, it seems to me, to overthrow it, or to make it proper to discard it. But if the evidence of McDaniel were left out of the case, I should still be sufficiently convinced that the defendant has been guilty of the sin of adultery, as charged in the bill. The act of adultery can rarely be proved by positive evidence. The guilty parties, through fear and through shame, generally use all their ingenuity to keep it secret, and if it be proved at all, it is almost always indirectly, and by evidence of various circumstances, each of which may

appear trivial in itself, but the aggregate of which is convincing, and sometimes nearly conclusive. It is barely possible, from the evidence in this case, that the defendant may be innocent, as it has been said by a learned ecclesiastical judge, that it is physically possible that two persons of different sexes may be in the same bed together without sexual intercourse, but the courts cannot act on such presumptions. The evidence in this case cannot be said to be equivocal. The acts of the defendant obtrude themselves upon the mind, and her words rivet conviction. To attribute her behavior to mere levity would be to exercise a charity which would infringe upon justice, and would be to refuse to draw a reasonable inference from the facts which are in evidence.

The answer states that after the time of the alleged discovery of the offence of the respondent, the plaintiff lived with her, and treated her as in all former times of their married life. This I take to be a sufficient urging of condonation by the plaintiff as a defence to this suit, and I do not conceive that even thus much need be stated in the answer in order to give the defendant the benefit of that defence, which is one that belongs to society as well as herself.

It has been urged in the argument that, since no mention of condonation as a defence to a suit for a divorce is anywhere made in our statute, the whole doctrine must be considered as foreign to our jurisprudence. I do not understand that our legislature, in passing the divorce act, intended or attempted to codify the whole law appertaining to that subject, and that our law of divorce is necessarily limited and circumscribed to the mere letter of the statute. The doctrine of condonation is familiar in all English and American courts, where divorces are granted or permitted, and it would hardly seem to be the intention of the legislature to destroy it unless there was some enactment to that effect. Although the statute provides that the proper court shall have power to grant divorces for adultery, yet the court is not bound to do so. The same discretion is left with the court as was formerly left with the ecclesiastical

court, a discretion which is to be exercised according to equitable principles, and with due regard to the rights of the parties, the interests of society, and the welfare of the offspring of the marriage.

If a person have a right to a divorce for adultery, cruel treatment, or any other cause, he is not bound to exercise it, or to enforce it. He may waive it, or abandon it. The law permits him to elect to live with the wife who has dishonored him, if he prefers it, and whenever he knows that she has committed adultery, and he can make proof of it, and then voluntarily cohabits with her, the law allows that he has made his election. *Williamson vs. Williamson, J. C. R.* 488: nor ought any blame to attach to the law because it requires men to be somewhat consistent, and causes the effect of their forgiveness to live somewhat longer in some cases than the transitory feelings which prompt them.

The peace and quiet of families, the tranquility of society, and a proper regard for the welfare of the issue of the marriage which may be born or engendered after the time of the condonation, afford the most potent reasons on which the principle rests.

It appears by the bill, that the plaintiff was informed of the most material facts in evidence in this case, on or about the 15th of December, 1859, and that he was thereupon so well convinced of the guilt of his wife, that he immediately took steps to secure a divorce. He was well enough satisfied of her transgression to endeavor, straightway, to be legally separated from her, whom, he says, he had hitherto loved with an exceeding affection; and fully enough convinced to shoot her paramour, as is shown by the evidence. He knew that he could make, by Stidham and McDaniel, the same proof which is made by them here; and which would satisfy any reasonable tribunal of his right to a divorce. There was nothing to blind him in the matter. It was all apparent before him, as well what his wife had done, as what the law permitted him to do. He had his choice to rely on his legal rights, or to forgive his erring

wife, and receive her again to his bosom. Unfortunately for his success in this suit, he chose the latter. The night after he shot the adulterer he passed in jail; his wife visited him in prison. Upon his release, next day, he returned to his room at the Anthony House, and staid there with his wife, as before, until he left the State with her. · The evidence elsewhere shows that there was but one bed in the room. Soon after he was let out of jail, he went to Danley and told him that he was sorry that ladies had quit visiting his wife; that he had heard that it was because there was a current report that he had caught Connor in an improper connection ·with her; that the report was false; that he had shot him because he had spoken to her after he had forbidden him to do so. Within a few days afterward, the plaintiff went to Memphis with his wife, occupying the same stateroom on the steamboat which carried them thither, and when they got to Memphis, where the defendant's father lives, they lived together as man and wife, and during the two or three months they were there together, they both occupied one room. Soon after the plaintiff arrived there, he went to the editor of a newspaper, got into a quarrel with him because he had published an account of the affair between the plaintiff and Connor, which contained reflections on the defendant's virtue, and was instrumental in causing a retraction of the offensive article to be published by the same editor. During their stay at Memphis, the plaintiff took his wife to visit his relatives, and his sister returned with him, and staid with them for some time, and during all this time the chief solicitude of the plaintiff seems to have been to make the world think that his wife was innocent.

If any thing was wanting to this overwhelming array of facts, it is to be found in the letters which he wrote to his wife, when absent at times, from January 19th, 1860, to the following 4th of July. These letters are very affectionate in their spirit and language. He calls her his dear Frank, and expresses the most earnest care for her health and her happiness. He is profuse in his expressions of conjugal affection: he is anxious to hear

often from her; he sends her money; he urges her to take care of her health, speaks of the incidents of his travels; entreats her in some of his letters to seek the consolations of religion as above all others; tells her of his success in his business, which was gambling on a game called rondeau, and speaks of the pleasure which he anticipates at their meeting. In May, 1860, he parted from her kindly, and wrote to her in the same manner up to within seventeen days of filing his bill in this cause; but within a short time after the commencement of this suit, he told one of the witnesses that he was under engagement to marry another lady residing in Louisiana.

This evidence shows that with a full knowledge of his wife's guilt, he received and kept her as his wife still, that he remitted her fault, and forgave her the violation of her marriage vows. And having taken this course, he cannot now be allowed to revive the memory of her sins, to parade them before the public, and make them the basis of his relief. He had the right to forgive her or not, as he saw fit, but having once forgiven, it is not his privilege to retract his pardon, to subserve the purposes of his passion, his caprice or his interest. He has passed an act of oblivion which heals all, and, in the eyes of the law, for all time to come. And although the severance of family ties by guilt and by dissension, is one of the most melancholy subjects that can be presented for the consideration of any tribunal, yet there is in this case but little which can awaken the sympathy of the court on behalf of either party.

Absent Mr. Justice FAIRCHILD.